JUDGE FAILLA

PREET BHARARA
United States Attorney for the
Southern District of New York
By:  SHARON COHEN LEVIN
     MICAH W. J. SMITH
     Assistant United States Attorneys
     One Saint Andrew's Plaza
     New York, New York 10007
Telephone:  (212) 637-1060
Facsimile:  (212) 637-0421

13 CV 5182

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

            Plaintiff,            :

        - v. -                    :

S.A.C. CAPITAL ADVISORS, L.P.;    :
S.A.C. CAPITAL ADVISORS, LLC;     :
CR INTRINSIC INVESTORS, LLC; and  :
SIGMA CAPITAL MANAGEMENT, LLC,    :

                                  :

            Defendants,           :

                                  :

ANY AND ALL ASSETS OF S.A.C.
CAPITAL ADVISORS, L.P.; S.A.C.    :
CAPITAL ADVISORS, LLC; CR         :
INTRINSIC INVESTORS, LLC; and     :
SIGMA CAPITAL MANAGEMENT, LLC,    :

                                  :

ANY AND ALL ASSETS OF S.A.C.
OFFSHORE CAPITAL FUNDING, LTD.;   :
S.A.C. SPECTRUM FUND, LLC; S.A.C. :
GLOBAL MACRO FUND, LLC; S.A.C.    :
ARBITRAGE FUND, LLC; S.A.C.       :
MULTIQUANT FUND, L.P.; S.A.C.     :
GLOBAL INVESTMENTS, L.P.; S.A.C.  :
PRIVATE EQUITY INVESTORS, L.P.;   :
S.A.C. DOMESTIC INVESTMENTS, L.P.;:
S.A.C. DOMESTIC CAPITAL FUNDING,  :
LTD.; CANVAS CAPITAL ASSOCIATES,  :
LLC; SIGMA CAPITAL ASSOCIATES,    :
LLC; S.A.C. CAPITAL ASSOCIATES,   :

VERIFIED COMPLAINT

13 Civ.

ECF Case



RECEIVED JUL 2 5 2013 U.S.D.C. S.D.N.Y. CASHIERS

```
LLC; S.A.C. STRATEGIC INVESTMENTS,  :
LLC; S.A.C. MERIDIAN FUND, LLC;
S.A.C. INTERNATIONAL EQUITIES,      :
LLC; CR INTRINSIC INVESTMENTS,
LLC; INTERNATIONAL EQUITIES         :
(S.A.C. ASIA), LTD.; S.A.C.
STRUCTURED INVESTMENTS, L.P.;       :
SIGMA FIXED INCOME FUND, LTD.;
S.A.C. SELECT FUND, LLC; S.A.C.     :
ENERGY INVESTMENTS, L.P.; S.A.C.
GENESIS FUND, LLC; S.A.C. HEALTHCO  :
FUND, LLC; and S.A.C. DOMESTIC
INVESTMENTS (CA), LLC,              :

              Defendants in Rem.    :

- - - - - - - - - - - - - - - - - -x
```

Plaintiff the United States of America (the "Government"), by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, for its complaint ("Complaint") alleges, upon information and belief, as follows:

## I.  NATURE OF THE ACTION

1.   This action is brought by the Government pursuant to 18 U.S.C. §§ 981(a)(1)(A), 1956, and 1957, seeking the forfeiture of certain property involved in laundering the proceeds of insider trading offenses and the imposition of civil money laundering penalties.

2.   As set forth in more detail below, insider trading offenses were committed by numerous employees of corporate entities responsible for the management of a major hedge fund. This insider trading was substantial, pervasive, and on a scale without known precedent in the hedge fund industry.  It resulted

in hundreds of millions of dollars of illegal profits and avoided losses at the expense of members of the investing public.  The illegal profits from this criminal conduct were then commingled with other assets, used to promote additional insider trading, and transferred with the assistance of financial institutions.

3.  On or about July 23, 2013, a Grand Jury sitting in the Southern District of New York returned a sealed five-count Indictment, 13 Cr. 541 (the "Indictment") charging S.A.C. CAPITAL ADVISORS, L.P. ("SAC CAPITAL LP"); S.A.C. CAPITAL ADVISORS, LLC ("SAC CAPITAL LLC"); CR INTRINSIC INVESTORS, LLC ("CR INTRINSIC"); and SIGMA CAPITAL MANAGEMENT, LLC ("SIGMA CAPITAL") (collectively, the "SAC ENTITY DEFENDANTS" or "Defendants in Personam") with committing wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5 and 240.10b5-2; and 18 U.S.C. § 2.  A true and correct copy of the Indictment, which was unsealed today, is attached hereto as Exhibit A and is incorporated by reference as if fully set forth herein.

4.  By this Complaint, the Government seeks forfeiture of all right, title and interest in the following property (collectively, the "Defendants in Rem"):

(a)  ANY AND ALL ASSETS OF THE SAC ENTITY DEFENDANTS; and

(b)  ANY AND ALL ASSETS OF S.A.C. OFFSHORE CAPITAL FUNDING, LTD.; S.A.C. SPECTRUM FUND, LLC; S.A.C. GLOBAL MACRO FUND, LLC; S.A.C. ARBITRAGE FUND, LLC; S.A.C. MULTIQUANT FUND, L.P.;  S.A.C. GLOBAL INVESTMENTS, L.P.; S.A.C. PRIVATE EQUITY INVESTORS, L.P.; S.A.C. DOMESTIC INVESTMENTS, L.P.; S.A.C. DOMESTIC CAPITAL FUNDING, LTD.; CANVAS CAPITAL ASSOCIATES, LLC; SIGMA CAPITAL ASSOCIATES, LLC; S.A.C. CAPITAL ASSOCIATES, LLC; S.A.C. STRATEGIC INVESTMENTS, LLC; S.A.C. MERIDIAN FUND, LLC; S.A.C. INTERNATIONAL EQUITIES, LLC; CR INTRINSIC INVESTMENTS, LLC; INTERNATIONAL EQUITIES (S.A.C. ASIA), LTD.; S.A.C. STRUCTURED INVESTMENTS, L.P.; SIGMA FIXED INCOME FUND, LTD.; S.A.C. SELECT FUND, LLC; S.A.C. ENERGY INVESTMENTS, L.P.; S.A.C. GENESIS FUND, LLC; S.A.C. HEALTHCO FUND, LLC; and S.A.C. DOMESTIC INVESTMENTS (CA), LLC (collectively, the "SAC INVESTMENT FUNDS").

5.    The Government also seeks civil money laundering penalties against the SAC ENTITY DEFENDANTS in an amount to be determined at trial.

## II.  JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

7.    Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

### III.   THE DEFENDANTS

### The Defendants in Personam

8.   At various times relevant to this Complaint, the SAC ENTITY DEFENDANTS were affiliated corporate entities responsible for managing a group of affiliated hedge funds ("SAC" or "SAC Hedge Fund").

9.   SAC CAPITAL LP is a Delaware limited partnership with its principal business office in Stamford, Connecticut.  SAC CAPITAL LP has actively managed investments in the SAC Hedge Fund since in or about 2009, when it was assigned the employment and investment management contracts of SAC CAPITAL LLC and became the parent company to CR INTRINSIC and SIGMA CAPITAL.

10.  SAC CAPITAL LLC is a Delaware limited liability company that was incorporated in or around 1995.  From at least in or around 1999, up to and including in or around 2008, SAC CAPITAL LLC actively managed investments in the SAC Hedge Fund. SAC CAPITAL LLC's principal business office was in Stamford, Connecticut.

11.  CR INTRINSIC is a Delaware limited liability company that was incorporated in or around 2004.  From at least in or around 2006, up to and including in or around 2013, CR INTRINSIC has actively managed investments in the SAC Hedge Fund.  CR INTRINSIC's principal business office is in Stamford, Connecticut.

5

12.  SIGMA CAPITAL is a Delaware limited liability company that was incorporated in or around 2001.  From at least in or around 2002, up to and including in or around 2013, SIGMA CAPITAL has actively managed investments in the SAC Hedge Fund. SIGMA CAPITAL's principal business office is in Manhattan, New York.

### The Defendants in Rem

13.  In addition to seeking the forfeiture of any and all assets of the SAC ENTITY DEFENDANTS, this Complaint seeks the forfeiture of any and all assets of the SAC INVESTMENT FUNDS. The SAC INVESTMENT FUNDS are limited partnerships and limited liability companies organized in the United States and elsewhere, including the Cayman Islands and Anguilla, that were in existence since at least in or around 2008 or that are successors to investment funds in existence in or around 2008.

14.  At various times relevant to this Complaint, the SAC INVESTMENT FUNDS held most of the SAC Hedge Fund's assets and received investment management services from one or more of the SAC ENTITY DEFENDANTS or other SAC fund management companies.

### IV.  FACTUAL ALLEGATIONS

### The Structure Of The SAC Hedge Fund

15.  At all times relevant to this Complaint, an individual residing in Greenwich, Connecticut (the "SAC Owner") operated the SAC Hedge Fund.  At its peak, the SAC Hedge Fund included

approximately $15 billion of assets under management.  The
majority of the capital managed by the SAC Hedge Fund belonged
to the SAC Owner himself, with the balance of capital provided
by outside investors.  At all times relevant to this Complaint,
the assets of the SAC Hedge Fund were held primarily by the SAC
INVESTMENT FUNDS.

16.  At all times relevant to this Complaint, the SAC Owner
operated the SAC Hedge Fund through his ownership of several
fund management companies, which served as investment advisors
for the SAC Hedge Fund.  These management companies generally
charged outside investors annual fees of approximately three
percent of assets under management and up to 50 percent of
investment returns.  At all times relevant to this Complaint,
one or more of the SAC ENTITY DEFENDANTS were the principal
management companies of the SAC Hedge Fund.

17.  At most times relevant to this Complaint, the SAC
Hedge Fund's structure included "feeder funds" ("SAC Feeder
Funds") that allocated capital to the various SAC INVESTMENT
FUNDS, either directly or through an intermediate holding
company, and at the direction of the SAC ENTITY DEFENDANTS.  As
a result of this investment structure, outside investors
generally did not invest directly in the SAC ENTITY DEFENDANTS
or the SAC INVESTMENT FUNDS.  Instead, outside investors
generally invested in the SAC Feeder Funds, from which they

purchased shares or partnership interests.  The capital obtained by the SAC Feeder Funds from the sale of these shares or partnerships was allocated to the various SAC INVESTMENT FUNDS and pooled with the capital provided by the SAC Owner himself.

### The Allocation Of Capital Within The SAC Hedge Fund

18.  At most times relevant to this Complaint, the SAC ENTITY DEFENDANTS were active investment advisors and directed the SAC INVESTMENT FUNDS to use significant leverage, engage in short-sale transactions, and exercise various options and arbitrage strategies.  At the direction of the SAC ENTITY DEFENDANTS, the SAC INVESTMENT FUNDS frequently invested in equities, secured and unsecured debt, futures, forward contracts, options, convertible bonds and preferred stock, derivative instruments, contracts for differences, currencies, and commodities.

19.  At all times relevant to this Complaint, the SAC Hedge Fund placed restrictions on investors' ability to make withdrawals from the SAC INVESTMENT FUNDS.  Any profits the SAC Hedge Fund earned from the execution of securities transactions were not immediately withdrawn from the SAC INVESTMENT FUNDS, but rather were generally used to make new investments on behalf of the SAC INVESTMENT FUNDS.  At all times relevant to this Complaint, the SAC Hedge Fund made reinvestments of any profits

from its sales of securities with the assistance of multiple prime brokers.

20.  At all times relevant to this Complaint, the SAC ENTITY DEFENDANTS retained and exercised the authority to direct that capital be transferred between and among the SAC INVESTMENT FUNDS.  For example, in a private offering memorandum from 2009 for the largest SAC Feeder Fund, the SAC Hedge Fund explained that SAC CAPITAL LP "may, from time to time in its sole discretion, refine or change its investment methods and strategies" and "allocate whatever amount of [the SAC Feeder Fund's] capital to any" of the SAC INVESTMENT FUNDS "in its sole discretion."  The private offering memorandum added that "[s]uch allocations of capital will vary, often materially, over time."

21.  At most times relevant to this Complaint, the SAC ENTITY DEFENDANTS followed an investment management approach in which SAC Hedge Fund assets were frequently reallocated to potentially outperforming strategies.

### The SAC Portfolios

22.  The SAC ENTITY DEFENDANTS and other management companies affiliated with the SAC Hedge Fund employed dozens of portfolio managers ("SAC PMs") to manage the capital of the various SAC INVESTMENT FUNDS.  SAC PMs were allocated investment capital from the SAC INVESTMENT FUNDS and were responsible for the profit-and-loss results of their portfolios.

9

23. SAC PMs specialized in particular investment sectors, such as technology, health care, financial services, industrial, consumer, or energy. Each SAC PM, in turn, typically employed one or more research analysts ("SAC RAs") to assist with the development of investment ideas for the SAC PM's portfolio.

24. At all times relevant to this Complaint, the SAC Hedge Fund portfolios were in many ways autonomous from each other. Each SAC PM had substantial discretion to make investment decisions in his or her portfolio, even if a position was contrary to a position taken by other SAC PMs operating a portfolio in the same sector. SAC PMs were compensated principally based on the performance of their own portfolios, and without regard to the investment performance of other SAC PMs. Likewise, SAC RAs were compensated largely at the discretion of the SAC PM to whom they reported and based on the profitability of that PM's portfolio.

25. At all times relevant to this Complaint, the largest portfolio in existence at the SAC Hedge Fund was a portfolio managed by the SAC Owner himself. The SAC Owner had sole trading discretion over his portfolio and made these decisions principally based on trading recommendations from SAC PMs.

26. At all times relevant to this Complaint, the SAC Owner required each SAC PM to share "high conviction" investment ideas — i.e., the investment recommendations in which the SAC PM had

10

the greatest confidence — with the SAC Owner.  In fact, providing such ideas to the SAC Owner was an express part of a SAC PM's duties and was emphasized to SAC PMs in the hiring process and once working at SAC.

### Bonus Payments To SAC Employees

27.  At all times relevant to this Complaint, the SAC ENTITY DEFENDANTS formally tracked trades made by the SAC Owner in the portfolio he personally managed in order to "tag" or credit the SAC PM responsible for the idea.  At all times relevant to this Complaint, the SAC ENTITY DEFENDANTS paid SAC PMs an annual bonus — which could in some cases exceed all other components of compensation — based on a percentage of the net profits made by the SAC Owner on trades "tagged" to a particular SAC PM.

28.  At certain times relevant to this Complaint, the SAC Hedge Fund made bonus payments to its SAC PMs and SAC RAs through wire transfers.  These wire transfers were deposited into the bank accounts of the SAC PMs and SAC RAs, which accounts were held at financial institutions whose deposits were at all relevant times insured by the Federal Deposit Insurance Corporation ("FDIC").

### Overview Of The Insider Trading Scheme

29.  At various times between in or 1999 through at least in or about 2010, employees and agents of the SAC ENTITY

11

DEFENDANTS obtained material, non-public information ("Inside Information") relating to publicly-traded companies and, on behalf of the SAC ENTITY DEFENDANTS and using the capital of the SAC INVESTMENT FUNDS, traded on that Inside Information.

30.   The SAC ENTITY DEFENDANTS committed this insider trading scheme through the acts of, among others, numerous SAC PMs and SAC RAs who engaged in a pattern of obtaining Inside Information from dozens of publicly-traded companies across multiple industry sectors.   Employees of the SAC ENTITY DEFENDANTS traded on Inside Information for the portfolios they managed and, at times, recommended trades to the SAC Owner based on Inside Information.

31.   While engaging in this insider trading scheme, SAC ENTITY DEFENDANTS obtained the Inside Information by telephone, e-mail and other electronic forms of interstate communication, while located in SAC ENTITY DEFENDANT offices in Manhattan, New York and elsewhere.

32.   The following individual SAC PMs or SAC RAs, identified by name, have been charged with and/or convicted of insider trading in connection with one or more of the SAC ENTITY DEFENDANTS:

a.   Wes Wang ("Wang") was a SAC RA specializing in the technology sector employed by SIGMA CAPITAL from approximately 2002 to 2005.   While serving as a SAC RA, Wang

obtained Inside Information with respect to various technology
companies, including but not limited to Taiwan Semiconductor
Manufacturing Company ("TSMC"), Cisco Systems, Inc. ("Cisco"),
Broadcom Corporation ("Broadcom"), eBay, Inc. ("eBay"), Cypress
Semiconductor Corporation ("Cypress"), Polycom, Inc.
("Polycom"), QLogic Corporation ("QLogic"), and Cirrus Logic
Inc. ("Cirrus").  Wang provided trading ideas based on Inside
Information to the SAC PM to whom he reported ("Sigma PM-1").
On or about July 13, 2013, Wang pled guilty in federal court to
two counts of conspiracy to commit securities fraud, one of
which involved insider trading in connection with Wang's
employment at SIGMA CAPITAL from 2002 to 2005.  At his guilty
plea, Wang admitted that, while at SIGMA CAPITAL, he obtained
Inside Information and provided it to Sigma PM-1 to be used for
the purchase and sale of securities.

     b.   Richard Choo-Beng Lee ("CB Lee") was a SAC RA
specializing in the technology sector employed by SAC CAPITAL
LLC from approximately 1999 to 2003 and by SIGMA CAPITAL from
approximately 2003 to 2004.  While serving as a SAC RA, CB Lee
obtained Inside Information with respect to various technology
companies, including but not limited to Intel Corporation
("Intel"), Advance Micro Devices, Inc ("AMD"), and Altera
Corporation ("Altera").  CB Lee provided trading ideas based on
Inside Information to the portfolio manager to whom he reported

and the SAC Owner.  On or about October 13, 2009, CB Lee pled guilty in federal court to, among other things, conspiracy to commit securities fraud and wire fraud relating to trading recommendations based on Inside Information that CB Lee had provided to Sigma PM-1 and others following CB Lee's departure from SIGMA CAPITAL.  At his guilty plea, CB Lee admitted that he obtained Inside Information and that he purchased and sold securities based in part on such Inside Information.

c.  Jon Horvath was a SAC RA specializing in the technology sector employed by SIGMA CAPITAL from approximately 2006 through 2011.  Horvath served as a research analyst for portfolio manager Michael Steinberg, who has been employed by SIGMA CAPITAL from approximately 2003 to the present, and as a portfolio manager for SAC CAPITAL LLC from approximately 1996 to 2003.  On or about September 28, 2012, Horvath pled guilty in federal court to conspiracy and securities fraud for insider trading Horvath committed while at SIGMA CAPITAL, including but not limited to insider trading in relation to Dell Inc. ("Dell") in August 2008 and NVIDIA Corporation ("NVIDIA") in May 2009. Horvath admitted at his guilty plea that he obtained Inside Information about Dell and NVIDIA and provided the Inside Information to Steinberg, who executed trades in these stocks based on that information.  On or about March 28, 2013, a grand

jury in the Southern District of New York returned an indictment charging Steinberg with insider trading at SIGMA CAPITAL.

d.    Noah Freeman was a SAC PM specializing in the technology sector who was employed by SAC CAPITAL LLC in approximately 2008 and by SAC CAPITAL LP from approximately 2009 to early 2010.  While serving as a portfolio manager, Noah Freeman obtained and/or traded on Inside Information from various technology companies, including but not limited to, Research in Motion, Ltd. ("RIMM"), NVIDIA, Marvell Technology Group, Ltd. ("Marvell"), Avnet, Inc. ("Avnet"), Fairchild Semiconductor ("Fairchid"), Atheros Communications, Inc. ("Atheros"), Broadcom, and Dell.  On or about February 7, 2011, Noah Freeman pled guilty in federal court to, among other things, conspiracy and securities fraud for insider trading he committed while employed by SAC CAPITAL LLC and SAC CAPITAL LP. At his guilty plea, Freeman admitted that he obtained Inside Information, and that he purchased and sold securities based in part on such Inside Information in connection with his employment at SAC CAPITAL LLC and SAC CAPITAL LP.

e.    Donald Longueuil was a SAC PM specializing in the technology sector who was employed by CR INTRINSIC from approximately 2008 through 2010.  While serving as a portfolio manager, Longueuil obtained and/or traded on Inside Information from various technology companies, including but not limited to,

RIMM, NVIDIA, Marvell, Avnet, Fairchild, Atheros, Broadcom, and Dell.  On or about April 28, 2011, Longueuil pled guilty in federal court to, among other things, conspiracy and securities fraud for insider trading he committed while employed by CR INTRINSIC.  At his guilty plea, Longueuil admitted that, while he was employed by CR INTRINSIC, he received Inside Information for the purpose of trading on that information at CR INTRINSIC.

      f.   Mathew Martoma was a SAC PM specializing in the health care sector employed by CR INTRINSIC from aproximately 2006 to 2010.  On or about December 21, 2012, a grand jury in the Southern District of New York returned an indictment charging Martoma with insider trading at CR INTRINSIC relating to shares of Elan Corporation, plc ("Elan") and Wyeth.

      g.   Richard Lee was a SAC PM employed by SAC CAPITAL LP between approximately April 2009 and June 2011, and again between approximately September 2012 and March 2013, who focused on "special situations" across industry sectors such as mergers, acquisitions, private equity buy-outs and corporate restructurings.  While serving as a SAC PM, Richard Lee obtained Inside Information with respect to various securities, including but not limited to Yahoo! Inc. ("Yahoo") and 3Com Corporation ("3COM").  On or about July 23, 2013, Richard Lee pled guilty in federal court to an information charging Lee with conspiracy and securities fraud in connection with his employment at SAC

CAPITAL LP.   At his guilty plea, Richard Lee admitted that he obtained Inside Information and that he purchased and sold securities based in part on such Inside Information in connection with his employment at SAC CAPITAL LP.

33.   The SAC ENTITY DEFENDANTS enabled and promoted the insider trading scheme by seeking to hire PMs and RAs believed by the SAC Owner and others in SAC management to have an "edge" based in part on networks of contacts with employees of public companies, who were likely to possess Inside Information, in the sector in which the SAC PM or SAC RA specialized.   The focus on hiring employees with such networks was not balanced by any corresponding effort to ensure that prospective SAC PMs and SAC RAs candidates did not use these contacts to obtain illegal Inside Information.

34.   The SAC Owner also enabled and promoted the insider trading scheme by ignoring indications that trading recommendations were based on Inside Information, and instead encouraging SAC PMs and SAC RAs through financial incentives and otherwise to share "high conviction" trading ideas — including ideas developed through industry contacts likely to possess Inside Information.   In particular, on multiple occasions SAC PMs and SAC RAs communicated to the SAC Owner trading recommendations sourced to information from a contact "at" a public company or with similar language.   In these cases, the

17

SAC Owner failed to inquire whether the contact was permitted to disclose the company information or to take other steps to ensure that the trade was not based on Inside Information.

35.   Similarly, in connection with the hiring process, the SAC Owner failed to question candidates who at minimum implied that their "edge" was based on sources of Inside Information. For example, on several occasions in June 2009, CB Lee spoke to the SAC Owner about the possibility of providing the SAC Owner with trading ideas on particular companies in return for a payout on the SAC Owner's profits.   CB Lee told the SAC Owner that he had people in sales and in finance at NVIDIA who gave him information relating to quarterly earnings and a contact at TSMC who provided him with wafer data.   The SAC Owner did not express any concern about CB Lee's proposed sources of information during these conversations.

36.   The SAC Owner also furthered the insider trading scheme by fostering a culture that focused on not discussing Inside Information too openly, rather than not seeking or trading on such information in the first place.   For example, on or about July 29, 2009, a recently hired SAC PM (the "New PM") sent an instant message to the SAC Owner and relayed that, due to some "recent research," the New PM planned to short Nokia when he started work ten days later.   The New PM apologized for being "cryptic" but noted that the head of SAC compliance "was

18

giving me Rules 101 yesterday — so I won't be saying much[.]
[T]oo scary." The SAC Owner did not react or respond in the
instant message to the New PM's proposal to trade securities
based on information that the New PM was "scar[ed]" to tell the
SAC Owner for fear of violating compliance rules.

37. The SAC ENTITY DEFENDANTS further enabled and promoted
the insider trading scheme by employing limited compliance
measures designed to detect or prevent insider trading by SAC
PMs or SAC RAs. For example:

a. The SAC ENTITY DEFENDANTS automatically purged
all instant messages after 36 hours and all e-mails not
affirmatively saved after 30 days until adopting a revised
document retention policy in September 2008. In addition, prior
to approximately late 2009, SAC's compliance department rarely
reviewed electronic communications by SAC employees for
suspicious terms suggesting potential insider trading,
notwithstanding the fact that the head of SAC compliance had
recommended such searches to SAC management as early as 2005.

b. Although the SAC compliance department, beginning
in approximately 2006, prohibited the use of expert networks to
make payments to public company employees for industry
information, SAC encouraged direct contact with public company
employees at various levels outside of these networks. For
example, in or around 2006, when Richard Lee initially

interviewed for a job at SAC and told a senior SAC executive
that his investment process involved, among other things,
consultations through an expert network, the SAC executive
responded in substance that most SAC PMs relied on their own
personal networks of industry contacts.  In fact, as reflected
in examples noted elsewhere in this Complaint, SAC PMs and SAC
RAs routinely consulted public company employees at various
levels and recommended trading ideas to the SAC Owner expressly
based on information obtained through contacts at these
companies.

      c.   Notwithstanding that the SAC compliance
department was apparently aware that expert networks presented a
risk of insider trading, the SAC compliance department failed to
effectively monitor SAC employees' use of expert networking
firms.  For example, the SAC compliance department failed to
detect or prevent Martoma from using an expert network for
approximately 42 consultations with a doctor involved in an
Alzheimer's disease drug trial (the "Drug Trial"), even though
some of the expert networking firm's scheduling e-mails with
Martoma — sent through the SAC e-mail system — expressly stated
that (1) the doctor in question had confidential information
about the Drug Trial; and (2) the purpose of the consultation
was to ask the doctor about the experimental medicine being
tested in the Drug Trial.  The doctor in question in fact

provided Martoma with Inside Information about the Drug Trial
during many of these consultations.

d.   On several occasions, SAC management failed to
refer trading recommendations that appeared to be based on
Inside Information to SAC's compliance department for
investigation.  For example, on or about October 30, 2007,
Horvath's trading recommendation e-mailed to the SAC Owner
concerning Sun stated "[m]y edge is contacts at the company and
their distribution channel."  Steinberg, who was copied on the
e-mail, forwarded it to the SIGMA CAPITAL Chief Operating
Officer (the "COO") with the comment: "I suspect the line about
contacts at the company may wake up some of our legal eagles."
The COO responded: "I think it might precipitate a general
inquiry to confirm we are not in possession of non public
information.  This seems like an investment idea, not a trade
and my interpretation of his comment is just that he developed
good relationships with mgmt. that enhance his comfort level."
The COO arrived at this benign (and unsubstantiated)
interpretation without anyone interviewing Horvath about his e-
mail.  In truth and in fact, Horvath's e-mail was based on
confidential information about Sun earnings that Horvath had
obtained from his contact at Sun.

e.   The limited number of internal investigations by
the SAC compliance department of insider trading were generally

21

weak, with a focus on "confirming" with a SAC PM or SAC RA in an interview that an e-mail implying access to Inside Information was just an inartfully drafted e-mail.   In fact, despite numerous documented cases of insider trading at SAC — established by, among other things, guilty pleas of six former SAC PMs and RAs who each committed insider trading on numerous occasions and over a substantial period of time while employed at SAC — SAC's compliance department contemporaneously identified only a single instance of suspected insider trading by its employees in its history.

       f.   SAC's resolution of the one case in which it identified suspected insider trading also reflected a lack of commitment to address the issue. On this occasion, information reviewed by SAC's compliance department demonstrated that a SAC PM at CR INTRINSIC ("CR Intrinsic PM-1") and a second SAC PM ("SAC PM-1") had received and then traded based on an advance tip from an outside health care analyst (the "Health Care Analyst") at a research firm doing business with the SAC ENTITY DEFENDANTS.   Despite this, and despite the fact that it was the SAC Owner who had initially inquired about the trading, the consequences were limited.   The SAC ENTITY DEFENDANTS imposed monetary fines on two the offenders, but allowed them to keep their jobs, and failed to report the insider trading to any regulatory or law enforcement personnel.

38. At bottom, the encouragement by the SAC ENTITY DEFENDANTS of SAC PMs and SAC RAs to pursue aggressively an information "edge" overwhelmed limited SAC compliance systems. Further, the relentless pursuit of an information "edge" fostered a business culture within SAC in which there was no meaningful commitment to ensure that such "edge" came from legitimate research and not Inside Information. The predictable and foreseeable result was systematic insider trading by the SAC ENTITY DEFENDANTS resulting in hundreds of millions of dollars of illegal profits and avoided losses at the expense of members of the investing public. The illicit profits the SAC ENTITY DEFENDANTS gained from their insider trading scheme were substantially larger than any operating expenses reasonably attributable to their scheme.

## Examples Of Insider Trading By Agents Of Each Of The SAC ENTITY DEFENDANTS

39. In connection with the scheme described above, the SAC ENTITY DEFENDANTS, through the conduct of their agents, sought to obtain and trade upon Inside Information on multiple occasions between 1999 and at least 2010. In some cases, instances of insider trading involved agents of multiple SAC ENTITY DEFENDANTS either because the relevant agents worked for different management companies or because the agents switched between management companies during the course of their

employment.   The specific instances of insider trading include —
but are not limited to — the conduct discussed below.

### CR INTRINSIC: Trading By Martoma And The SAC Owner In Elan And Wyeth

40.   As of mid-July 2008, the SAC Hedge Fund's largest
equity securities position consisted of over $700 million worth
of Elan American Depository Receipts ("ADRs") and Wyeth common
stock.   The SAC Owner had accumulated the position in large part
on the recommendation of Martoma.   On or about July 17, 2008,
Martoma obtained negative Inside Information from a medical
doctor involved in the Drug Trial being conducted by Elan and
Wyeth.   On or about Saturday, July 19, 2008, Martoma met with
the doctor in person in Michigan.   On or about the morning of
Sunday, July 20, 2008, Martoma spoke by telephone to the SAC
owner, who the next day began selling the entire $700 million
position and shorting approximately $260 million worth of Elan
and Wyeth stock prior to the public announcement of the Drug
Trial results on or about July 29, 2008.   The SAC Hedge Fund's
profits and avoided losses from this illegal insider trading
amounted to approximately $276 million.

### CR INTRINSIC: Trading By Two SAC PMs And The SAC Owner Based On Information From CR Intrinsic RA-1

41.   On various occasions in 2008 and 2009, a technology
sector research analyst for CR Intrinsic ("CR Intrinsic RA-1")
obtained Inside Information from contacts at various technology

companies, including earnings information from Dell (from the
same source who provided Inside Information to Horvath) and
acquisition-related information from Foundry Networks Inc.   The
two SAC PMs to whom CR Intrinsic RA-1 reported and the SAC Owner
all placed profitable trades on one or more occasions shortly
after recommendations made on the basis of Inside Information
known to CR Intrinsic RA-1.

### SIGMA CAPITAL: Trading By Steinberg And The SAC Owner Based On Information From Horvath

42.   On or about August 18, 2008, Horvath learned from a
contact in his network that an insider at Dell had disclosed
that Dell's earnings would be below market expectations and
provided that information to Steinberg, who immediately began
shorting shares of Dell stock in Steinberg's portfolio.   On or
about August 26, 2008 at 12:37 p.m., Steinberg e-mailed Horvath
that he had been "talking to [the SAC Owner] about Dell earlier
today" and that the SAC Owner wanted Horvath to "compare notes"
with a different SAC PM who had taken a contrary, bullish
position on Dell.   At approximately 1:09 p.m., Horvath responded
to Steinberg and the bullish SAC PM by e-mail: "I have a 2nd
hand read from someone at the company – this is 3rd quarter I
have gotten this read from them and it has been very good in the
last two quarters.   .  .  .   Please keep to yourselves as
obviously not well known."   The e-mail further reported that the

gross margin for Dell would fall short by "50-80 bps [basis points]." The bullish SAC PM then forwarded the Horvath e-mail to a "research trader" for the SAC Owner who assisted the SAC Owner in trading technology stocks. The research trader, in turn, forwarded Horvath's e-mail directly to the SAC Owner at approximately 1:29 p.m. and spoke by phone to the SAC Owner at 1:37 p.m. for approximately one minute. At approximately 1:39 p.m., the SAC Owner began selling Dell shares in his own portfolio, closing out his entire approximately $12.5 million position prior to the disappointing earnings announcement, avoiding losses of approximately $1.7 million. On or about August 28, 2008, after Dell had publicly announced earnings that, consistent with Horvath's Inside Information were below market expectations, the SAC Owner e-mailed Steinberg's group, including Horvath, "Nice job on dell."

**SIGMA CAPITAL: Trading By Sigma PM-1 Based On Inside Information**

43. Between approximately 2002 and 2005, in connection with his employment as a SAC RA, Wang recommended trades to Sigma PM-1 based on Inside Information that Wang obtained from a network of contacts at publicly-traded technology companies, including but not limited to TSMC, Cisco, Broadcom, Cypress, Polycom, QLogic, and Cirrus.

**SIGMA CAPITAL: Trading Based On Inside Information From CB Lee**

44.   Between approximately 2008 and 2009, former-SIGMA CAPITAL PM CB Lee, who by then was operating his own hedge fund, recommended trades based on Inside Information to Sigma PM-1. The Inside Information involved various technology sector stocks, including Dell and NVIDIA.  For example, in a recorded call on or about January 16, 2009, CB Lee told Sigma PM-1, "between you and me," that "a friend of my cousin" who "works for Dell finance," is "telling me to avoid the stock for Q2, because Q2 is gonna be horrible."  In a follow-up recorded call on or about January 23, 2009, CB Lee reiterated to Sigma PM-1 that "I do have a contact at Dell, he's in finance" and that the contact was reporting that the "April quarter could see a problem with gross margins" because sales to businesses were "very weak and that's where most of the profitability is."

**SAC CAPITAL LP: Trading By Richard Lee**

45.   On various occasions between approximately April 2009 through approximately 2010, Richard Lee — who had been hired by SAC CAPITAL LP despite a warning to the SAC Owner that he had been part of an "insider trading group" at a prior employer — traded on Inside Information in the $1.25 billion "special situations" SAC portfolio Richard Lee jointly managed with a second SAC PM.

27

46.   For example, Richard Lee obtained, from a contact at a private equity firm with a stake in Yahoo, both early access to a Yahoo earnings report and information relating to a contemplated partnership with Microsoft, the latter of which ultimately took place in or around July 2009.   Richard Lee — as well as other SAC PMs — also spoke to a technology analyst (the "Tech Analyst") from a research firm doing business with the SAC Hedge Funds about the potential Yahoo-Microsoft partnership.   In a recorded call with Richard Lee on or about July 10, 2009, the Tech Analyst told Richard Lee that his "buddy," a "senior guy at Microsoft" who had been "very, very accurate in the past," told the Tech Analyst that a "senior team from Yahoo" had arrived at Microsoft to meet "the two senior-most people in [the] Microsoft internet business" to restart deal talks.

### SAC CAPITAL LLC AND SIGMA CAPITAL: Trading Based On Inside Information From CB Lee

47.   In connection with his employment as a SAC RA at SAC CAPITAL LLC and then SIGMA CAPITAL, CB Lee sought and obtained Inside Information through direct and indirect contacts at various technology companies between approximately 1999 and 2004, including but not limited to Intel, AMD, and Altera.   CB Lee then recommended trades based on this Inside Information to the portfolio manager to whom he reported and in some instances to the SAC Owner directly.   In these trading recommendations, CB

28

Lee typically described the source of the information as "my guy," "my contact," or "my check" "at" the company in question.

## SAC CAPITAL LLC, SAC CAPITAL LP And CR INTRINSIC: Trading Based On Inside Information From Freeman And Longueuil

48.   In connection with their employment, Freeman (employed first by SAC CAPITAL LLC and then SAC CAPITAL LP) and Longueuil (employed by CR INTRINSIC) obtained and traded on Inside Information between apately 2008 and 2010 in a variety of technology companies, including but not limited to RIMM, NVIDIA, Marvell, Avnet, Fairchild, Atheros, Broadcom, and Dell.

### The Laundering Of Illicit Profits

49.   The criminal conduct of the SAC ENTITY DEFENDANTS did not end with the execution of their insider trading scheme.  It continued when the illicit profits from insider trading were knowingly commingled with other capital in the SAC INVESTMENT FUNDS; used to promote further trades based on Inside Information; and transferred to SAC employees, in the form of bonus payments, with the assistance of financial institutions. Through this course of conduct, the SAC ENTITY DEFENDANTS engaged in and were involved in money laundering, and involved the SAC INVESMTENT FUNDS in their money laundering scheme.

### The Use Of Illicit Profits To Promote The Scheme To Defraud

50.   At all times relevant to this Complaint, SAC PMs and SAC RAs of the SAC ENTITY DEFENDANTS generally knew that when

29

profits were obtained from investment decisions using the capital of the SAC INVESTMENT FUNDS, those profits would not be immediately withdrawn from the SAC INVESTMENT FUNDS, but instead generally would be pooled with other assets of the SAC Hedge Fund and used in future investment decisions within the SAC Hedge Fund and with the assistance of prime brokers.

51. Despite their knowledge of the structure of the SAC Hedge Fund, employees of the SAC ENTITY DEFENDANTS designed their insider trading scheme to use, not their own capital, but the capital of the SAC Hedge Fund held by the SAC INVESTMENT FUNDS. As a result of the systematic and pervasive insider trading directed by employees of the SAC ENTITY DEFENDANTS over many years, illicit profits from insider trading were commingled with legitimate proceeds and formed at least part of the funding of additional insider trading. Illicit profits from insider trading were particularly likely to form at least part of the proceeds for future insider trading because, as described above, SAC Hedge Fund assets were frequently reallocated to strategies perceived by the SAC Owner and SAC PMs as potentially outperforming.

52. In addition, illicit profits from insider trading were likely to form at least part of the proceeds for future insider trading because of the magnitude of the insider trades directed by employees of the SAC ENTITY DEFENDANTS. For example, as

30

alleged above, the SAC Hedge Fund in July 2008 began selling its entire $700 million position and shorted approximately $260 million worth of Elan and Wyeth stock based on Inside Information, and made profits and avoided losses in the amount of approximately $276 million.[*]

53.   Through various acts and omissions alleged above, at all times relevant to this Complaint, the SAC ENTITY DEFENDANTS enabled and encouraged their SAC PMs and SAC RAs to use the capital of the SAC INVESTMENT FUNDS to engage in insider trading.   The SAC ENTITY DEFENDANTS enabled and encouraged this conduct while intending that illicit profits from insider trading not be immediately withdrawn from the SAC INVESTMENT FUNDS, but instead be pooled with other assets of the SAC Hedge Fund and used in future investment decisions within the SAC Hedge Fund and with the assistance of prime brokers.   In this manner, the SAC ENTITY DEFENDANTS caused transactions using the profits of insider trading that were intended at least in part to promote additional insider trading within the SAC Hedge Fund.

---

[*] Separately, the SAC Hedge Fund had an interest in $12 million worth of Wyeth shares through multi-year "swap" contracts the SAC Hedge Fund had entered into with other financial institutions in February and March of 2008.   SAC did not, however, contact its swap counter-parties and seek to unwind the swaps, which would have risked disclosing that SAC was selling large portions in Wyeth in advance of the July 29, 2008 public announcement of the Drug Trial results.

54.  The SAC ENTITY DEFENDANTS engaged in other transactions using the profits of insider trading and designed to promote that unlawful conduct.  Among other things, at various times relevant to this Complaint, the SAC ENTITY DEFENDANTS promoted the insider trading scheme of its employees through their practice of paying year-end bonuses — drawn from the SAC Hedge Fund's pool of capital that included the illicit profits — to the employees who engaged in insider trading.  For example, at the end of 2008, after Mathew Martoma's insider trading in the securities of Elan and Wyeth, as described above, the SAC Hedge Fund paid him a bonus of approximately $9.3 million, drawn at least in part from the illicit profits of his insider trading.  These bonuses were paid to the SAC ENTITY DEFENDANTS' employees as a reward for their insider trading and served as encouragement for future insider trading.

### The Monetary Transactions Using The Illicit Profits

55.  At various times relevant to this Complaint, one or more of the SAC ENTITY DEFENDANTS allowed and directed the illicit profits from insider trading using the funds of the SAC INVESTMENT FUNDS to be reinvested in the SAC INVESTMENT FUNDS. The amount of profits obtained from insider trading was generally greater than $10,000.  In directing the reinvestment of capital in the SAC INVESTMENT FUNDS, the SAC ENTITY DEFENDANTS used the services of one of several prime brokers.

56.   At various times relevant to this Complaint, one or more of the SAC ENTITY DEFENDANTS paid year-end bonuses to its employees, drawn from the SAC Hedge Fund's pool of capital that included the illicit profits from insider trading.  In making these bonus payments, the SAC ENTITY DEFENDANTS made wire transfers into the bank accounts of the employees of the SAC ENTITY DEFENDANTS, which accounts were held at financial institutions whose deposits were insured by the FDIC.  The illicit profits distributed through these direct deposits were at certain times greater than $10,000.

57.   The SAC ENTITY DEFENDANTS knew, or consciously avoided knowing, that at least some of the proceeds used to make reinvestments on behalf of the SAC INVESTMENT FUNDS, and at least some of the proceeds used to pay year-end bonuses to SAC PMs and SAC RAs, constituted illicit profits from the insider trading the SAC ENTITY DEFENDANTS had enabled and encouraged.

### V.   CLAIMS FOR FORFEITURE

#### FIRST CLAIM FOR RELIEF

#### Forfeiture Under 18 U.S.C. § 981(a)(1)(A) – Promotion Money Laundering And Conspiracy

58.   The Government incorporates by reference paragraphs 1 through 57 above as if fully set forth herein.

59.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of

section 1956 . . . of [title 18, relating to money laundering offenses]" is subject to forfeiture to the Government.

60.    Pursuant to 18 U.S.C. § 1956(a)(1), commonly known as the "money laundering" statute, a crime is committed by any person who:

> (a)(1) knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity — . . .
>
>> (A)(i) with the intent to promote the carrying on of specified unlawful activity . . . .

61.    Pursuant to 18 U.S.C. § 1956(h), "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

62.    "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense listed under 18 U.S.C. § 1961(1).  Section 1961(1)(B) lists, among other offenses, violations of 18 U.S.C. § 1343 (relating to wire fraud) and "fraud in the sale of securities."

63.    The Defendants in Rem are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in financial transactions involving the

34

proceeds of specified unlawful activity, namely the wire fraud and securities fraud charged in the Indictment, which transactions were intended to promote such specified unlawful activity and carried out with knowledge that the property represented the proceeds of illegal activity. The Defendants in Rem also constitute property involved in a conspiracy to undertake such transactions.

### SECOND CLAIM FOR RELIEF

**Forfeiture Under 18 U.S.C. § 981(a)(1)(A) –
Money Laundering In Violation Of Section 1957 And Conspiracy**

64. The Government incorporates by reference paragraphs 1 through 57 above as if fully set forth herein.

65. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 . . . of [title 18, relating to money laundering offenses]" is subject to forfeiture to the Government.

66. 18 U.S.C. § 1957 provides that 1957 provides that "[w]hoever, [with such offense under this section taking place in the United States] knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity," shall guilty of a crime. A "monetary transaction" includes the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary

instrument . . . by, through, or to a financial institution."
18 U.S.C. § 1957(f)(1).

67.   Pursuant to 18 U.S.C. § 1956(h), "[a]ny person who
conspires to commit any offense defined in this section or
section 1957 shall be subject to the same penalties as those
prescribed for the offense the commission of which was the
object of the conspiracy."

68.   "Specified unlawful activity" is defined in 18 U.S.C.
§ 1956(c)(7), and the term includes any offense listed under 18
U.S.C. § 1961(1).  Section 1961(1)(B) lists, among other
offenses, violations of 18 U.S.C. § 1343 (relating to wire
fraud) and "fraud in the sale of securities."

69.   The Defendants in Rem are subject to forfeiture
pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute
property involved in monetary transactions in criminally derived
property of a value greater than $10,000 that was derived from
specified unlawful activity, namely the wire fraud and
securities fraud charged in the Indictment, and a conspiracy to
engage in such transactions.  The Defendants in Rem also
constitute property involved in a conspiracy to undertake such
transactions.

## VI.   CIVIL MONEY LAUNDERING PENALTIES

### THIRD CLAIM FOR RELIEF

### 18 U.S.C. § 1956

70.   The Government incorporates by reference paragraphs 1 through 57 above as if fully set forth herein.

71.   Pursuant to 18 U.S.C. § 1956(b), "[w]hoever conducts or attempts to conduct a transaction described in subsection (a)(1) [of section 1956] . . ., or section 1957, . . ., is liable to the United States for a civil penalty of not more than the greater of — (A) the value of the property, funds, or monetary instruments involved in the transaction; or (B) $10,000."

72.   The Defendants in Personam knowingly conducted financial transactions using the profits obtained from the wire fraud and securities fraud charged in the Indictment while intending the transactions to promote those specified unlawful activity.

73.   The Defendants in Personam also knowingly engaged in monetary transactions involving profits obtained from these specified unlawful activities, and therefore involving criminally derived property which was derived from specified unlawful activity.

74.   Such transactions were made by, through, and to financial institutions and involved property of a value greater than $10,000.

75.   Accordingly, the Defendants in Personam are liable to the United States for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

### REQUEST FOR RELIEF

WHEREFORE plaintiff, the United States of America, requests that judgment be entered as follows:

A.   Enter judgment against the Defendants in Rem, and in favor of the United States, on the first and second claims alleged in the Complaint.

B.   Issue process to enforce the forfeiture of the Defendants in Rem, requiring that all persons having an interest in the Defendants in Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendants in Rem to the United States of America for disposition according to law;

C.   Award the United States civil money laundering penalties from the Defendants in Personam on the third claim alleged in the Complaint, in an amount to be

proved at trial to a jury, plus prejudgment and
postjudgment interest.

D.    Grant the Government such further relief as this Court
may deem just and proper, together with the costs and
disbursements in this action.

Dated:  New York, New York
        July 25, 2013

                              PREET BHARARA
                              United States Attorney for
                              the Southern District of New York
                              Attorney for the Plaintiff
                              United States of America

                    By:       _____
                              Sharon Cohen Levin
                              Micah W. J. Smith
                              Assistant United States Attorneys
                              One St. Andrew's Plaza
                              New York, New York 10007
                              Telephone: (212) 637-1060
                              Facsimile: (212) 637-0421

## VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           )
SOUTHERN DISTRICT OF NEW YORK )

Gregory A. Coleman, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and as such has responsibility for the within action; that he has read the foregoing Verified Complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief.

The sources of deponent's information and the ground of his belief are official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials and representatives during an investigation of alleged violations of federal criminal laws.

Gregory A. Coleman
Special Agent
Federal Bureau of Investigation

Sworn to before me this
25th day of July, 2013:

NOTARY PUBLIC

40

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires May 6, 2014